UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CR 363 AGF (JMB) |
| | ) | |
| MARCUS ROCKETT, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on a pretrial motion filed by defendant Marcus Rockett ("Rockett"). More specifically, Rockett filed a Motion to Suppress Evidence and Statements ("Defendant's Motion to Suppress").[1] (ECF No. 32) The government filed a Response to Defendant's Motion to Suppress. (ECF No. 34) Broadly speaking, Rockett contends that the police lacked probable cause to stop him for a traffic violation on the evening of June 2, 2015. Therefore, according to Rockett, any evidence or statements taken from him in relation to the traffic stop must be suppressed as fruit of the poisonous tree.

Pretrial matters were initially referred to another United States Magistrate Judge of this Court. On December 16, 2015, an evidentiary hearing commenced regarding Defendant's Motion to Suppress. At the December 16, 2015 hearing, the government presented the testimony of St. Louis Metropolitan Police Department ("SLMPD") Detective James Wilcox.

---

[1] Also pending before the Court are the following motions: (1) the government's motion for a pretrial determination of the admissibility of Defendant's statements (ECF No. 13); (2) Defendant's oral motion to suppress (ECF No. 16); and (3) the government's oral motion for a determination of the admissibility of arguably suppressible statements (ECF No. 17). The government's motions (ECF Nos. 13 and 17) will be denied as moot. Defendant's generic, oral motion to suppress (ECF No. 16) is subsumed Rockett's specific Motion to Suppress.

Before that evidentiary hearing could be concluded, however, pretrial matters were reassigned to the undersigned Magistrate Judge, under 28 U.S.C. § 636(b).

On January 7, 2016, the evidentiary hearing resumed before the undersigned Magistrate Judge. Rockett was present and represented by Assistant Federal Public Defender Diane L. Dragan, and the government was represented by Assistant United States Attorney Thomas Mehan. At the hearing, the government again presented the testimony of Detective Wilcox. Defense counsel cross-examined Det. Wilcox extensively. Defense counsel subpoenaed and presented the testimony of three SLMPD Detectives – Jarred Thacker, Daniel Weber, and Lafeal Lawshea. Defense counsel also presented testimony from three lay witnesses: (1) Defendant's cousin, Brittnie Williams; (2) Leon Mills, who was with Rockett on the night in question; and (3) Defendant's sister, Latoya Rockett. The government cross-examined the three lay witnesses.

Near the end of the January 7, 2016, evidentiary hearing, Rockett indicated a desire to testify on his own behalf. After a discussion with counsel for both parties, the undersigned adjourned the hearing to give defense counsel and Rockett more time to discuss the issue of testifying.

The evidentiary hearing resumed on January 8, 2015, at which time defense counsel indicated that she had consulted with Rockett and it was Rockett's decision not to testify. The undersigned made a detailed record of Rockett's decision not to testify at the evidentiary hearing. The undersigned concluded that Rockett understood his right to testify or not testify, and that his decision not to testify was made knowingly, intelligently, and voluntarily. Rockett was permitted, however, to present testimony from Earnest Birch, who has been an investigator for the Federal Public Defender in this District for many years. Over several government objections, Rockett was also permitted to submit a video recording of his interview with the Circuit

2

Attorney's Office for the City of St. Louis. (Def. Exh. M)[2]

At the conclusion of the presentation of evidence, defense counsel requested the opportunity to submit a post-hearing memorandum. Government's counsel preferred to argue and submit the case. The undersigned permitted the parties to argue their positions, but also granted defense counsel's request to file a post-hearing memorandum.

Rockett filed a detailed post-hearing memorandum. (ECF No. 63) Rockett contends that the police stopped his car without reasonable suspicion or on the basis of any traffic violation. Rockett argues that any evidence seized from his car, or statements made by him, should be suppressed as fruits of an illegal car stop.

The government filed a post-hearing response. (ECF No. 67) In its response, the government argues that the police had probable cause to stop Rockett's car for a traffic violation. The government also takes issue with some of the factual characterizations made by Rockett.

Based on the testimony and evidence adduced at the December 16, 2015, January 7, 2016, and January 8, 2016, evidentiary hearings, and having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses during the January 7th and 8th hearings, the undersigned makes the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

1.In June 2015, Markus Rockett had family that lived in the 4800 block of Farlin Avenue, in the City of St. Louis. On the evening of June 2, 2015, Rockett was visiting family and friends at the family home on Farlin. On that date, Rockett drove a red Monte Carlo.

2.On the evening of June 2, 2015, SLMPD Detectives Wilcox and Thacker were

---

[2] The video has a date stamp of 3.6.2015, which the undersigned interprets as June 3, 2015. The video recording documents Rockett's version of events associated with his arrest on June 2, 2015.

assigned to a special operations unit. As part of their duties, Detectives Wilcox and Thacker were patrolling the Penrose neighborhood of the City of St. Louis. The Penrose neighborhood was known as a high crime area where there had been recent shootings. Detectives Wilcox and Thacker conducted their patrol in an unmarked Mazda vehicle, which was equipped with police lights and a siren (the lights being mounted on the visor rather than on top of the car). Detective Thacker was driving the car on June 2, 2015. The detectives' duties permitted them to conduct stops for traffic violations.

3. At approximately 10:30 p.m. on June 2nd, Detectives Wilcox and Thacker were in their car in an alley near the intersection of Farlin Avenue and Shreve Avenue and observed a red Monte Carlo commit a traffic violation. The incident began when the detectives observed the red Monte Carlo turn left off of Farlin onto Shreve. The detectives observed that the driver of the Monte Carlo failed to signal and stop at the intersection before turning from Farlin onto Shreve. The detectives later determined that Rockett was driving the Monte Carlo with Leon Mills riding in the passenger seat.

4. The detectives activated their lights and sirens and pursued the Monte Carlo on Shreve. At some point early in the pursuit, Det. Wilcox erroneously called out on the police radio that the traffic encounter began near Margaretta and Euclid, but he accurately described the vehicle as a red Monte Carlo with two occupants. At the January 7, 2016, hearing, Detective Wilcox acknowledged that his initial call out regarding the location was incorrect. Margaretta Avenue runs parallel to Farlin and is one block south of Farlin. (See Def. Exhs. A, A-1, and B)

5. The Monte Carlo did not stop or pull over in response to the activation of the lights and siren on the detectives' car. The Monte Carlo traveled one block on Shreve Avenue before turning left on Kossuth Avenue. While on Kossuth, Detective Wilcox observed the

4

Monte Carlo in what Detective Wilcox believed to be a near accident situation with another vehicle. Detective Thacker estimated that the Monte Carlo was travelling around 50 miles per hour on Kossuth. At approximately that time, the detectives deactivated their lights and siren because their policy precluded a dangerous pursuit for a traffic violation. The detectives continued to follow the Monte Carlo on Kossuth.

6. The testimony and evidence at the hearing indicated Kossuth and Farlin Avenues are each one-way streets (one block apart, and parallel to each other), with cars typically parked on both sides of the street. (See Def. Exhs. A, A-1, B, and H) The Monte Carlo proceeded on Kossuth for one block, turning left on North Euclid Avenue. The detectives observed the Monte Carlo failed to signal as it turned onto North Euclid Avenue. At approximately this time, the detectives reactivated the lights and siren on their car. The Monte Carlo traveled one block on North Euclid Avenue, back to the intersection with Farlin Avenue. The Monte Carlo next turned left back onto Farlin Avenue. Detective Wilcox observed the driver of the Monte Carlo in another near accident at the intersection of North Euclid and Farlin Avenues.

7. The Monte Carlo stopped shortly after turning back on to Farlin Avenue from North Euclid Avenue. According to the detectives, Farlin was blocked by another car. Near the end of the pursuit, Detective Wilcox made another radio call out, this time more accurately describing the detectives' position near Farlin Avenue.[3]

---

[3] From beginning to end, the pursuit of the red Monte Carlo followed a square pattern around one city block, as shown in Defendant's Exhibits A, A-1, B, and H. This route of travel is relevant because, although Detective Wilcox's radio callout regarding his location during the pursuit was incorrect, the relevant witnesses for the government and Rockett all testified that the Monte Carlo followed this same route. Contrary to Rockett's argument, the undersigned views the timing of the radio callouts (see Addendum B-2 to Rockett's Memorandum in Support; ECF No. 63-2) as tending to corroborate Detective Wilcox. The time elapsed is consistent with a high speed chase around one city block, as described by the detectives. Moreover, if the detectives were truly at Margaretta and Euclid at the beginning of the pursuit, they would have been ahead

8. The detectives parked at a distance behind the Monte Carlo on Farlin and exited their vehicle. The detectives ordered the two occupants to place their hands up and out of the windows for safety purposes. According to the police testimony, the passenger, later identified as Leon Mills, immediately complied with the request. The driver, later identified as Defendant Markus Rockett, did not comply. Rather, Rockett put his hands out and then brought them back in, perhaps dropping his keys in the process. Detective Thacker observed Rockett drop his left shoulder, and then dip his right arm rather than comply with their command to show his hands. Detective Thacker estimated that he ordered Rockett to place his hands out of the window seven or eight times.

9. Based on Rockett's actions, the detectives assumed that Rockett was armed and they drew their weapons for their own safety. Detective Thacker "fanned out" to a point at which he was moving parallel to the driver's side door of the Monte Carlo. Detective Thacker's position provided him with a view into the driver's side of the Monte Carlo.

10. Rockett eventually complied with the detectives' commands and stuck his hands out of the driver's side window. Detective Thacker removed Rockett from the vehicle, and Detective Wilcox removed Leon Mills from the passenger side.

11. Rockett and Mills were handcuffed and taken to the rear of the Monte Carlo,

---

of the Monte Carlo, not behind as Ms. Williams' testified.
  Detective Wilcox's incident report (Def. Exh. D) also included errors with respect to directions. For example, Detective Wilcox's report erroneously described the Monte Carlo as turning eastbound on Kossuth, then southbound on Kossuth, and westbound back onto Farlin. Nonetheless, when viewed in its totality, Detective Wilcox's report fairly described the Monte Carlo as driving in a square pattern from Farlin to North Euclid Avenue and from Euclid back to Farlin. (See Def. Exhs. A, A-1, D, and H) When viewed in the context of all of the relevant testimony and exhibits, Detective Wilcox's mistakes in describing directions/locations are not critical. As noted below, even Brittnie Williams, a defense witness with family in the area, seemed confused about street directions and locations in the area. All of the witnesses testified to the exact same route of travel.

where the officers conducted a brief search of their persons and removed property. Rockett and Mills were then placed at the curb.

12. In connection with commanding Rockett to put his hands out of the window and removing Rockett from the Monte Carlo, Detective Thacker observed what he believed to be Rockett stuffing something by the seat of the Monte Carlo. Detective Thacker advised Detective Wilcox of his observation. Detective Wilcox looked inside the car from the open driver's side door and observed the butt of a gun sticking out between the car seat and the center console. Thereafter, Detective Wilcox physically entered the Monte Carlo and retrieved a handgun. The gun was a loaded semi-automatic pistol with one live round in the chamber. Detective Wilcox rendered the weapon safe and stored it on his person.

13. After Rockett and Mills were removed from the Monte Carlo, and after Detective Wilcox retrieved the handgun, Detective Wilcox advised Rockett he was under arrest for felony fleeing and traffic violations.[4] Detective Wilcox read Rockett his <u>Miranda</u> rights from a preprinted card. Rockett acknowledged his rights and briefly spoke with Detective Wilcox. There is no indication in the record that Rockett was coerced or threatened into making statements.

14. Detective Wilcox also took several photographs of the scene with a department issued digital camera. These photographs were marked as Defense Exhibits C-1 through C-6, and admitted into evidence for purposes of the evidentiary hearings. There were no photographs taken of the driver's side of the Monte Carlo or of the handgun at the scene because Detective Wilcox's camera battery died. Two photographs of the handgun were taken later in the evening.

---

[4] The criminal complaint issued on June 3, 2015, charges Rockett with "Resisting Arrest/detention/stop By Fleeing – Creating A Substantial Risk of Serious Injury/death To Any Person," in violation of RSM. 575.150. (Def. Exh. G)

(Def. Exhs. C-7, C-8)

15. A photograph taken from the rear of the Monte Carlo (Def. Exh. C-1) clearly showed that, at that time of night, an officer approaching the vehicle from behind would have been able to view the driver's actions, as described by Detectives Wilcox and Thacker.

16. The initial police activity at the scene of the car stop (Farlin Avenue) was conducted entirely by Detectives Wilcox and Thacker. By the time Detectives Weber and Lawshea arrived at the Farlin scene, both Rockett and Mills were secured at the curb by the Monte Carlo and the handgun had already been seized. Detectives Weber and Lawshea did not participate in any search of Rockett or the Monte Carlo, and neither of these detectives questioned Rockett or read him his rights. Detective Weber testified that both Rockett and Mills appeared calm. Detective Weber recalled Detective Wilcox asking for batteries, but that he (Detective Weber) did not have any batteries to provide.

17. While at the Farlin Avenue scene, Detective Lawshea used a laptop to check the serial number of the handgun seized from the Monte Carlo. This was corroborated by records from REJIS. (Gov. Exh. A-2) The gun was stolen. Detective Lawshea also ran Rockett's criminal history.

18. Brittnie Williams, Rockett's cousin, testified on his behalf. According to Ms. Williams, on the evening on June 2, 2015, she and Rockett both left the family house on Farlin Avenue to go to a store. They drove in separate cars. Ms. Williams drove in the lead car, with Rockett following her in his red Monte Carlo. Ms. Williams described a route of travel identical to the route described by Detectives Wilcox and Thacker. Ms. Williams, however, testified that she did not see a police vehicle following her or any police flashing lights until she had turned on North Euclid off of Kossuth (which was shortly before Rockett turned back on to Farlin

8

Avenue). Ms. Williams believed that the police car was coming from another location, not Kossuth. Ms. Williams testified that she did not observe Rockett commit any traffic violations or cause any near collisions.

19. Ms. Williams initially testified that, after she observed Rockett turn off of North Euclid, back on to Farlin, she terminated her trip to the store and turned down the next street, Margaretta. Ms. Williams indicated that she parked on Margaretta and walked back to the family home on Farlin. (See, e.g., Def. Exh. H) Like Detective Wilcox, however, Ms. Williams was confused regarding street directions and locations. Ms. Williams eventually changed her testimony and concluded that she must have turned down San Francisco, rather than Margaretta, because Margaretta was a one-way street. (See, e.g., Def. Exh. B) Had she turned on Margaretta and parked as she initially testified, she would have been travelling the wrong way. San Francisco is one block farther away from Farlin than Margaretta.

20. The undersigned credits the testimony of Detectives Wilcox and Thacker to the extent it conflicts with that of Ms. Williams.

21. Leon Mills, the passenger in Rockett's Monte Carlo, also testified at the evidentiary hearing. Mr. Mills described the same route of travel that was described by Detectives Wilcox and Thacker, and Ms. Williams. Mr. Mills testified that he immediately complied with the detectives' orders to place his hands up and out of the window. Mr. Mills testified that Rockett immediately complied as well. Mr. Mills testified that he never saw a gun, and never heard Rockett talk about a gun with the police that night. Mr. Mills never heard anyone read Rockett his Miranda rights. Mr. Mills grew up with Rockett and his family and is from the neighborhood.

22. Although much of Mr. Mills' testimony corroborated that of Detectives Wilcox

9

and Thacker, to the extent that Mr. Mills' testimony conflicts with that of the detectives, the undersigned credits the detectives' testimony.

23. Rockett's sister, Latoya Rockett, also testified at the evidentiary hearing. Latoya Rockett was not with Ms. Williams or Rockett in the time leading up to the traffic stop. Rather, Latoya Rockett was driving to Farlin Avenue from Kingshighway when she came upon Rockett's Monte Carlo, which had already been pulled over by the detectives. Latoya Rockett parked her vehicle nearby and walked down Farlin Avenue to her grandmother's house. Latoya Rockett observed Rockett standing behind the Monte Carlo as she walked by. Latoya Rockett observed photographs being taken and overheard an officer say something about a charge of fleeing. By the time Latoya Rockett arrived at her grandmother's house, Ms. Williams was already there. Latoya Rockett and Ms. Williams then walked back to the Monte Carlo. Latoya Rockett testified that there had been a shooting earlier that evening on a nearby street – Margaretta Avenue. Latoya Rockett's testimony is not in substantial conflict with that of Detectives Wilcox and Thacker.

24. Federal Public Defender Investigator Ernest Birch testified for Rockett. Mr. Birch highlighted alleged inconsistencies and errors in police reports and accounts and other records and evidence. The undersigned has considered all of the evidence and records submitted in this matter, including all alleged errors and inconsistencies in the documentary evidence.

## CONCLUSIONS OF LAW & RECOMMENDATION

### I. Stop and Arrest of Defendant

Defendant's Motion to Suppress, as submitted in his post-hearing memorandum to the Court, rests on Rockett's contention that that the initial stop of his vehicle on June 2, 2015, was unlawful. According to Rockett, any evidence or statements taken from him or his vehicle

constitute fruit of the poisonous tree and must be suppressed. See Wong Sun v. United States, 371 U.S. 471, 484-86 (1963). The fundamental issue in this case, as framed by Rockett, is whether the police lawfully stopped his Monte Carlo on June 2, 2015.

"A traffic stop is considered a seizure for Fourth Amendment purposes." United States v. Guevara, 731 F.3d 824, 827 (8th Cir. 2013). See also Whren v. United States, 517 U.S. 806, 809-10 (1996). To justify such a seizure, "officers need only 'reasonable suspicion' – that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." Heien v. North Carolina, 135 S. Ct. 530, 536 (2014) (quoting Navarette v. California, 134 S. Ct. 1683, 1687-88 (2014)). Likewise, an officer's decision to stop a car is "reasonable" for Fourth Amendment purposes, if the officer has "probable cause to believe a traffic violation has occurred." Whren, 517 U.S. 810 (citing cases). The seriousness of the violation is not relevant. Rather, "[a]ny traffic violation, however minor, provides probable cause for a traffic stop." United Sates v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) (citation omitted). The officer's subjective motivations for stopping the vehicle are likewise not relevant, "even if the officer conducted the valid traffic stop as a pretense for investigating other criminal activity." United States v. Hambrick, 630 F.3d 742, 746 (8th Cir. 2011); see also Whren, 517 U.S. at 812-13 (explaining that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"). Further, a traffic stop supported by probable cause "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996).

It is the government's burden of showing that probable cause existed to justify the traffic stop. United States v. Andrews, 454 F.3d 919, 922 (8th Cir. 2006). If an officer has probable cause to believe the driver of a vehicle committed an offense, the officer may normally arrest the

driver without violating the Fourth Amendment. This is true even if state law provides only for the issuance of a summons for the particular violation. See Virginia v. Moore, 553 U.S. 164, 166-67, 180 (2008); United States v. Castleman, 795 F.3d 904, 912-13 (8th Cir. 2015).

In this case, the government has met its burden of establishing probable cause to justify the traffic stop and arrest on June 2, 2015. Detectives Wilcox and Thacker observed a red Monte Carlo commit a violation – failure to stop at a stop sign and failure to signal. Therefore, there was sufficient probable cause to warrant a traffic stop. Rockett, however, failed to stop his vehicle, resulting in the police pursuing the red Monte Carlo for most of a full city block, at which time the police observed Rockett commit additional traffic violations, and engage in dangerous driving on Kossuth and North Euclid Avenues.[5] Rockett's driving behavior cannot be divorced from the additional context that it occurred in a high crime area which, at the time, had experienced significant instances of violent conduct and recent shootings. Thus, the record before the undersigned establishes that the traffic stop was supported by probable cause. Therefore, the traffic stop was lawful and Rockett's fruit of the poisonous tree argument cannot be sustained.

## II. Seizure of the Handgun

Rockett's argument for suppression hinges on his contention that the traffic stop was unlawful. Therefore, according to Rockett, any evidence seized from him or the Monte Carlo should be suppressed as fruit of the poisonous tree. Because the undersigned has concluded that

---

[5] The detectives' testimony supports a conclusion that they observed multiple traffic violations before the red Monte Carlo stopped. The fact that some of those violations occurred after the officers initiated their pursuit does not render the latter violations irrelevant for Fourth Amendment purposes. Pursuit alone does not result in a seizure. See California v. Hodari D., 499 U.S. 621, 625-26 (1991) (explaining that a seizure requires some component force to restrain movement, and that a mere "show of authority" does not constitute a seizure for Fourth Amendment purposes); United States v. Taylor, 462 F.3d 1023, 1026 (8th Cir. 2006).

the traffic stop was constitutionally sound, Rockett's fundamental premise is not sustained. Nonetheless, for completeness, the undersigned also addresses the seizure of the handgun from the Monte Carlo.

When police conduct a lawful vehicle stop for a traffic violation, they may order the occupants to exit the vehicle without violating the Constitution. See United States v. Beatty, 170 F.3d 811, 813 (8th Cir. 1999). In this case, given the circumstances of the traffic stop, which included flight from the police in a high crime area, the officers reasonably requested the occupants of the Monte Carlo to raise their hands and place them out of the vehicle windows. While Mills immediately complied, Rockett did not. Detective Thacker observed Rockett's shoulder dip and other movement which suggested to the detective that Rockett might be armed. After Rockett failed to promptly comply with directives to show his hands, both Detectives Thacker and Wilcox drew their weapons. Both detectives were initially positioned to the rear of the Monte Carlo. Detective Thacker fanned out from the rear and moved toward the driver's side door.

After Rockett complied with commands to show his hands, Detective Thacker approached the driver's side door and removed Rockett from the Monte Carlo, placed him in handcuffs, and moved him to the rear of the vehicle. During this process, Detective Thacker observed Rockett stuffing an object between the seat and the console. Detective Thacker reported his observation to Detective Wilcox, who had secured Mills. Thereafter, Detective Wilcox approached the driver's side of the Monte Carlo and observed a butt of a handgun between the seat and the console. Detective Wilcox retrieved the handgun and rendered it safe.

Based on the facts outlined herein, Detective Wilcox was justified in seizing the handgun without a warrant for two reasons – the automobile exception and plain view doctrine.

### A. Automobile Exception

"The Fourth Amendment forbids unreasonable searches and seizures. It is well settled that a warrantless search of an automobile is not unreasonable if law enforcement officers have probable cause to believe that the vehicle contains evidence of criminal activity." United States v. Daniel, 809 F.3d 447, 448- 49 (8th Cir. 2016) (citing United States v. Ross, 456 U.S. 798, 823-24 (1982)). "Probable cause exists when the facts available to an officer would warrant a person of reasonable caution to believe that contraband or other evidence of a crime is present." Id. at 449 (citing Florida v. Harris, 133 S. Ct. 1050, 1055 (2013)). See also United States v. Aguilera, 625 F.3d 482, 486 (8th Cir. 2010) (automobile exception applies when there is probable cause that the vehicle contains contraband or evidence of a crime).

The undersigned concludes that, even before Detective Thacker or Detective Wilcox observed the butt of a handgun in the Monte Carlo, the detectives possessed sufficient probable cause to search the passenger compartment for weapons or other contraband. At the time of the stop, the detectives were patrolling a high crime area; there had been recent shootings in the area. Although the detectives did not yet know the identities of the two occupants of the Monte Carlo, they observed the vehicle driving at a relatively high rate of speed, and evading the officers' attempt to conduct a traffic stop. The detectives further observed the driver (Rockett) dip his shoulder and refuse to comply with directives to show his hands, suggesting the driver was armed or hiding an object from police detection. Therefore, "the facts available to [Detectives Thacker and Wilcox] would warrant a person of reasonable caution to believe that contraband or other evidence of a crime is present." Daniel, 809 F.3d at 449. Accordingly, the search of the Monte Carlo was reasonable under the automobile exception to the Fourth Amendment's warrant requirement.

Moreover, even if the detectives lacked probable cause to trigger the automobile exception when the Monte Carlo stopped on Farlin Avenue, the facts and circumstances the detectives encountered justified a protective search of the vehicle under Terry v. Ohio, 392 U.S. 1 (1968) and Michigan v. Long, 463 U.S. 1032 (1983). As the Eighth Circuit has explained:

> The principle announced in Terry has been extended to include vehicle searches. See Long, 463 U.S. at 1049 …. Observing that "roadside encounters between police and suspects are especially hazardous," the Court in Long held, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief … that the suspect is dangerous and the suspect may gain immediate control of weapons." Id. Additionally, it is settled that once reasonable suspicion is established, a protective search of a vehicle's interior is permissible regardless of whether the occupants have been removed from the vehicle. See id. at 1052 ….

United States v. Stewart, 631 F.3d 453, 457 (8th Cir. 2011). In the present case, the detectives encountered the Monte Carlo at night, in a high crime area. The Monte Carlo did not stop when the detectives attempted to conduct a traffic stop. When the Monte Carlo finally stopped, the driver did not immediately comply with directives to show his hands. Detective Thacker observed the driver's shoulder dip and other movements suggesting that the driver was armed or trying to hide something. Therefore, the detectives had sufficient, articulable reasonable suspicion to conduct a protective search of the passenger compartment of the Monte Carlo.

B. **Plain View Doctrine**

Even if the detectives lacked probable cause to search the passenger compartment of the Monte Carlo after pursuing the car in a high crime area and after Rockett failed to comply with directives to show his hands, the facts indicate that the detectives saw the handgun, in plain view, as part of the process of lawfully removing Rockett from the vehicle.

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971). See also

15

Horton v. California, 496 U.S. 128, 130 (1990) (clarifying Coolidge and explaining that discovery by inadvertence is not necessary to justify a plain view seizure). "An object may be seized by the police without a warrant under the plain view doctrine if '(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself.'" United States v. Vinson, 805 F.3d 1150, 1152 (8th Cir. 2015) (quoting United States v. Collins, 321 F.3d 691, 694 (8th Cir. 2003)). "Once an officer has lawfully stopped a vehicle, … he can approach it even if all the occupants have been removed." Id. (citing Beatty, 170 F.3d at 814). Viewing the interior of the vehicle, without entering it, does not constitute a search which would violate the Fourth Amendment. Id. Therefore, if a police officer observes a weapon or other contraband while looking into a vehicle, the officer may lawfully seize that weapon or contraband without a warrant under the plain view doctrine. Id.

The facts in this case indicate Detective Thacker observed Rockett stuff an object between the seat and the console while removing Rockett from the Monte Carlo. Detective Wilcox then went to the driver's side door and observed the butt of a handgun between the seat and the console. Given all of the facts and circumstances associated with the traffic stop, the incriminating character of the weapon would have been readily apparent to any officer. Once observed, the detectives could constitutionally retrieve and render the weapon safe. Id.[6]

---

[6] In this case, once Detective Wilcox observed the handgun in plain view, a search of the Monte Carlo would have also been justified pursuant to the automobile exception. Stated differently, once the butt of the handgun was observed, the officers were justified in searching the Monte Carlo pursuant to both the plain view doctrine, and the automobile exception. Thus, even if the automobile exception was not triggered by events earlier in the encounter, the officers had probable cause to search the vehicle at the moment the gun was actually seized.

**III.     Defendant's Statements**

Similar to the gun seizure issue, Rockett's position is that the traffic stop was unlawful and, therefore, any statements he made thereafter must be suppressed as fruit of the poisonous tree. The undersigned has concluded that the traffic stop was constitutionally sound. Therefore, Rockett's fundamental premise is defeated. Nonetheless, for completeness, the undersigned will briefly address the issue of whether Rockett's statements were obtained in violation of the Fifth Amendment.

Generally, statements to law enforcement officers made during custodial interrogation are subject to those procedures set out in Miranda v. Arizona, 384 U.S. 436, 477-78 (1966). See United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "Not every confession obtained absent the Miranda warnings is inadmissible, however, because 'police officers are not required to administer Miranda warnings to everyone whom they question.'" Id. (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). Rather, Miranda warnings are required only when the suspect is in custody and subjected to interrogation. See id. When applicable, such warnings must be given before questioning begins. See Miranda, 384 U.S. at 444.

Because Miranda applies only to custodial interrogation, voluntary statements by a suspect which are not in response to questioning are not subject to Miranda. See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). "Custodial interrogation means questioning initiated by law enforcement officers after the suspect has been taken into custody …." Illinois v. Perkins, 496 U.S. 292, 296 (1990) (citations and quotations omitted).

In this case, the officers displayed weapons, placed Rockett in handcuffs, and arrested him for a traffic violation. Rockett was in custody at the time he made any statements to Detective Wilcox. Detective Wilcox advised Rockett of his Miranda rights and Rockett

17

acknowledged that he understood his rights.[7] It was at this point that Rockett purportedly made incriminating statements. (ECF No. 60 at 22, Testimony of Det. Wilcox) There has been no suggestion made that Rockett's statements to Det. Wilcox were anything other than voluntary.

In view of the foregoing, the undersigned concludes that there is no basis in the existing record to suppress Rockett's statements to Detective Wilcox.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress (ECF No. 32) should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (ECF No. 32) and generic Oral Motion to Suppress (ECF No. 16) be **DENIED**.

**IT IS ORDERED** that the government's motions for a pretrial determination of the admissibility of evidence (ECF Nos. 13 and 17) be **DENIED** as moot.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  11th  day of March, 2016.

---

[7] Detective Wilcox testified that he advised Rockett of his Miranda rights twice – initially upon arresting Rockett, and again after it was determined that Rockett had a prior felony conviction that precluded him from possessing a gun.